J.S17045/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.P.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: T.P.G., NATURAL FATHER | : | |
| | : | |
| | : | No. 1689 WDA 2015 |

Appeal from the Order October 1, 2015
in the Court of Common Pleas of Fayette County Orphans' Court
at No(s): 19 Adopt 2015

BEFORE: GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                     **FILED MAY 11, 2016**

T.P.G. ("Father") appeals from the order dated and entered on October 1, 2015, granting the petition filed by J.L.A. ("Birth Mother") and her husband, D.J.A. ("Stepfather") to involuntarily terminate Father's parental rights to the minor, male child, T.P.G. ("Child"), pursuant to Section 2511(a)(1) and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a)(1) and (b). We affirm.

The trial court has set forth the relevant history of this case in its opinion. **See** Trial Ct. Op., 10/7/15, at 1-4. We adopt the trial court's recitation for purposes of this appeal. **See id**. Importantly, on May 11, 2015, Mother and Stepfather filed a petition to terminate the parental rights of Father to Child. On August 19, 2015, the trial court held a hearing on the petition.

---

[*] Former Justice specially assigned to the Superior Court.

At the hearing, Birth Mother testified on her own behalf. N.T., 8/19/15, at 8. Birth Mother testified that she had married Father in March of 2010, and divorced him in October of 2013. *Id.* at 3. Birth Mother testified that she married Stepfather in September of 2014, and that she had lived at her current address for two and a half years. *Id.* She stated that she has provided Father with her address and cell phone number, which she has had for two and a half years. *Id.* at 4. In fact, Father had used the cell phone number to contact her. *Id.* Birth Mother stated that, during the six months prior to the filing of the termination petition, Father had not (1) made any effort to visit Child, (2) contacted her about Child, (3) taken care of Child's wellbeing, and (4) sent Child gifts, cards, or letters. *Id.* Birth Mother testified that Father had not visited Child since December of 2012, and had not contacted her about Child since October of 2014. *Id.* at 4-5.

On cross-examination by Father's counsel, Birth Mother stated that Father had never paid her child support but that she had not sought child support. *Id.* at 5. Since Birth Mother and Father separated in July of 2012, Father had paid her a one-time lump sum in December of 2012 to cover child support. *Id.* Birth Mother explained that there was no custody agreement and that she has been Child's primary caregiver. *Id.* at 5. Birth Mother testified that Father has known her address and phone number from mail she sent him during his incarceration and from being "friends" on social media. *Id.* at 6. She stated that Father has had several multi-month stints

in jail. *Id.* Prior to December of 2012, Father met with Child every few weeks, and stayed in contact—but not constant contact—with Child. *Id.*

On cross-examination by Child's counsel, Birth Mother testified that Father had the address for her home, but he never asked her for directions. *Id.* at 6-7. Birth Mother also reiterated that Father had her cell phone number during the period after their separation. *Id.* at 7. Finally, Birth Mother testified that she was "friends" with Father on social media since 2012, and that Father had two social media accounts during that time, with his current account in use since 2014. *Id.* Birth Mother has posted pictures of Child on social media, and she testified that Father should have been aware of Child's growth and development through those pictures. *Id.*

Father also testified on his own behalf. Father stated that he has been incarcerated in the Somerset County Jail since January or February of 2013, for convictions of unauthorized use, agricultural vandalism, disorderly conduct, and a vehicle offense for driving with a suspended license–DUI-related. *Id.* at 8; Trial Ct. Op., 10/7/15, at 1. Father testified that he had not sought out Child prior to his incarceration and had only occasional short meetings when he would see, but not speak to, Child. N.T. at 9. Father explained that he was under the impression that Birth Mother believed he was not a good father. *Id.* He stated that Birth Mother had two different cell phone numbers; further, he was unaware of her address until recently because when her letters arrived at the jail, the corners of the envelopes

listing her address were ripped off. *Id.* Father testified that he had spoken with Birth Mother via social media and he had discussed meeting with her so that he could see Child, but the meeting never occurred. *Id.* Father stated that he received one letter regarding their divorce and another letter from an attorney that stated her address in a petition. *Id.* at 10.

Father testified that he did not interact with Child for the past two Christmases because he had been in the hospital for treatment of a leg infection in 2014, and had been incarcerated in 2013. *Id.* Father stated that he had not done anything for Child's birthday because he did not have any money or a phone, but he had attempted to make contact via social media. *Id.* Father said that he became aware of Mother's address on May 6, 2015, but did not attempt to contact Child. *Id.* Father last saw Child in June or July of 2013, while Birth Mother was at work for the day. *Id.* at 10-11. Father explained that he had not seen Child since 2013 because Birth Mother had told him that she did not want him in and out of Child's life. *Id.* at 11. Father stated that Birth Mother only took that position for a short period and then agreed to allow him to see Child, but he did not. *Id.* Father does not want to have his parental rights terminated because he believes there is still a chance for him to have a stable life. *Id.* at 12. Father stated that he made a payment for Child's support of approximately $90-$100 in 2013. *Id.* He also stated that he made payments of $120 per week toward Child's daycare for a month or two after the divorce. *Id.* at 13.

On cross-examination by Birth Mother's counsel, Father explained that since 2013, when he made the last payment, he had not held any stable employment. *Id.* at 13-14. Father stated that when he was working, he had to support five other individuals with whom he was living, including his brothers. *Id.* at 14-15. Father knew that Birth Mother and Stepfather were taking good care of Child. *Id.* at 15. Father reiterated he did not have a cell phone and used the public library computer to access social media. *Id.* at 15. Father stated that he sent Birth Mother a message on March 5, 2014, asking about Child. *Id.* Father testified that he had spoken with Birth Mother on a cell phone, but he did not remember the number. *Id.* Father stated that he last tried using Birth Mother's cell phone number in September of 2014. *Id.* He was unaware of whether Birth Mother still has the same cell phone number. *Id.* at 16.

On cross-examination by counsel for Child, Father admitted that his last payment for Child's care was near the end of 2013, and that he had not sent Child anything for his birthday or Christmas in the preceding two years. *Id.* Father indicated that he believed that Birth Mother was preventing him from having a relationship with Child, but he admittedly did not seek custody through the court. *Id.* at 16-17.

On re-direct examination, Father testified that he could not maintain a stable job partly because he lacked transportation and partly because he was in and out of jail. *Id.* at 17-18. Father also presented the testimony of

B.G., his mother; R.M., his stepfather; and K.G., his father. *Id.* at 18, 20, 22.

On October 1, 2015, the trial court terminated Father's parental rights. On October 23, 2015, Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father raises the following issue on appeal:

> Did the lower court abuse its discretion in terminating the parental rights of the natural father, T.P.G., as the natural mother, J.L.A., failed to present sufficient evidence to sustain her burden of proof?

Father's Brief at 3.

Father claims that prior to his incarceration in early 2013, he had regular contact with Child, but while incarcerated, he was unable to contact Birth Mother or Child by mail because he did not have their address. Father contends that he had no access to a telephone while he was incarcerated. Father argues that he attempted to remain in contact with Birth Mother and Child via social media, but that Birth Mother prevented him from having a relationship with Child. Father asserts that Birth Mother failed to present clear and convincing evidence necessary to sustain her burden of proof, because he utilized the resources available to him—social media—to remain in contact with Child, but Birth Mother precluded him from contacting Child. Thus, Father argues that the trial court abused its discretion in terminating his parental rights. *Id.* at 10.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental

rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.*** This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We focus on Section 2511(a)(1) and (b), which provide, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsections (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In ***In re Z.S.W.***, 946 A.2d 726 (Pa. Super. 2008), this Court stated:

> [t]o satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. ***In re Adoption of R.J.S.***, 901 A.3d 502, 510 (Pa. Super. 2006). In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>
> ***In re Adoption of Charles E.D.M.***, 550 Pa. 595, 708 A.2d 88, 91 (1998).
>
>> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).
>
> ***Id.*** at 92 (citation omitted).

***In re Z.S.W.***, 946 A.2d at 730.

Our Supreme Court has instructed:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the

repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and [] the causes of the incapacity cannot or will not be remedied.

*In re S.P.*, 616 Pa. at 328-29, 47 A.3d at 828.

With regard to a parent's incarceration, in *In re S.P.*, our Supreme Court reiterated the standard of analysis pursuant to Section 2511(a)(1) for abandonment and added as follows:

> [a]pplying [*In re McCray*, 460 Pa. 210, 331 A.2d 652 (1975),] the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [*Id.* at 217, 331 A.2d at 655]. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*
>
> *   *   *
>
> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re S.P.*, 616 Pa. at 327, 47 A.3d at 828. Further, the Supreme Court stated, "incarceration neither compels nor precludes termination of parental rights." *Id.* at 323, 47 A.3d at 825.

The Supreme Court concluded as follows:

we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.*, 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); *E.A.P.*, 944 A.2d at 85 (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).' If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re S.P.*, 616 Pa. at 331-32, 47 A.3d at 830-31.

The trial court carefully reviewed the testimony and the evidence presented by the parties and held that Father had failed to perform his parental duties for well over the six months prior to the filing of the termination petition. The trial court rejected Father's reasons for his abandonment of Child and his explanation for his lack of contact with Child as lacking credibility. We find that competent evidence of record supports the trial court order holding that for a period of at least six months prior to

the filing of the petition, Father has engaged in conduct evidencing a settled purpose of relinquishing his parental rights to Child under Section 2511(a)(1). *See In re S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27.

Next, this Court has explained that the focus in terminating parental rights under Section 2511(a) is on the parent, but under Section 2511(b), the focus is on the child. *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). Pursuant to Section 2511(b), we must consider whether the termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *Id.* at 1287 (citation omitted). The trial court must also discern the nature and status of the parent-child bond in the case, with utmost attention to the effect of permanently severing that bond on the child. *See id.*

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not

necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

Instantly, based upon evidence within the certified record, the trial court found that there is no bond between Father and Child, who is four years old, as Father has not seen or been in contact with Child since June or July of 2013. Additionally, Father admitted that he had not attempted to support Child because Birth Mother and Stepfather were taking good care of Child.

As we noted in *In re Z.P.*, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.P.*, 994 A.2d at 1125 (citation omitted). We emphasized, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs." *Id.* at 1119. Rather, "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

In this case, we hold that the competent, clear and convincing evidence in the record supports the trial court's conclusion that the termination of Father's parental rights would best serve Child's needs and

welfare because it would provide Child with the permanency and stability that he needs in his life. The court's legal conclusions are not the result of an error of law or an abuse of discretion. Accordingly, we affirm the trial court's decision with regard to Section 2511(b). *See In re S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2016

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA
ORPHAN'S COURT DIVISION

IN RE: ADOPTION OF
    T███ P███ G███

:
: NO. 19 ADOPT 2015

## OPINION

**Wagner, P.J.**

Before the Court is a Petition for Involuntary Termination of Parental Rights filed by the Minor's mother, who was married to the child's father at the time of the child's conception and birth. N.T. Involuntary Termination Proceedings, p. 3. The child was born on March 5, 2011, and is now four years old. Id. p. 2. Throughout the child's young life, Father has been in and out of incarceration on various charges including unauthorized use, agricultural vandalism, disorderly conduct and driving with a suspended license – DUI related. Id. p. 8. At the time of the hearing on this matter, Father was incarcerated in the Somerset County jail, and did not know when he might be released. Id.

Father admits that prior to his incarceration, he had never seen the child on any regular schedule or even intentionally by appointment, but rather would see him on "little occasions and stuff at the gas station." Id. p. 9. Father's sporadic and infrequent sightings of the child would be brief, and Father would "not even speak to him or nothing," Id., although Mother did not interfere with him or prevent him from doing so. Id. Father also admits that he never fulfilled his promises to see the child, even though Mother agreed that he should. Id. p. 11. Likewise, Father admits that he never did anything with the

1

child on any holidays, and never did anything for, or with, the child on the child's birthday. Id. p. 10. The last time he saw the child was in 2013. Id.

Pursuant to 23 Pa.C.S. §§ 2511, 2512, a parent has standing to seek termination of the other parent's parental rights to a child when the other parent has failed to perform parental duties *and* an adoption by a stepparent is contemplated and can take place concomitantly with an adoption of the child by a stepparent. See In re Adoption of L.J.B., 18 A.3d 1098 (Pa. 2011). A petition to terminate a natural parent's rights involuntarily filed by the other parent is cognizable only when it is accompanied by a prospective stepparent's intention to adopt the child. Id., pp. 1107-1108 fn 11. Mother and Father are now divorced, and Mother is re-married. Her current husband is willing and able to adopt the minor child.

The Court held a hearing on Mother's instant petition on August 19, 2015, at which Mother, as the petitioning party, had the burden of proving by clear and convincing evidence that her grounds for seeking to terminate Father's parental rights are valid. Clear and convincing evidence is that which enables the Court to come to a clear, non-hesitant conviction as to all specific supporting facts regarding Father's settled purpose of relinquishing his claim to the child. See In re: R.I.S. & A.L.S. Appeal of: C.S., Father, 36 A.3d 567 (Pa. 2011); see also Matter of Sylvester, 555 A.2d 1202 (Pa. 1989).

According to his own testimony, Father last saw the child in either June or July 2013 prior to his current incarceration, and has not attempted to contact the child in any way since. Father admits that he has not seen the child since 2013, and has never celebrated a holiday or birthday with him. Since he and Mother separated in July 2012,

2

Father has not financially supported the child, and has not sent him any cards, gifts, or letters. As an excuse, Father claims that he did not know Mother's address, but admitted that he was well aware of Mother's cell phone number which she has had for two and one-half years, and which he himself used to contact her. Id. pp. 4-5. He has not requested any photos of the child directly from Mother, nor has he taken any steps to seek any sort of formal custody arrangement. Father admits that he was able to contact Mother and speak to her, so although he now denies that he had her address. Id. pp. 9-10. The Court finds Mother's testimony that credible concerning Father's knowledge of her address, and obviously, Father could have asked her for the address while talking to her by telephone if he had wanted to talk to his son or send something to him. In addition, he concedes he received her address when he received a copy of the instant petition on May 6, 2015, but from that date until the day of the hearing more than three months later, had not attempted to contact the child. Id. He offered no explanation as to why he has done absolutely nothing to make intentional contact with his son in the three years between the parties' final separation and the hearing on the termination petition.

Father's testimony establishes that he has no bond with this four-year-old child, not having seen him, nor having been in even slight contact with him, since June or July of 2103 when the child was only two years old. Notwithstanding that Father was "put on notice," so to speak, by the filing of the termination petition, he still failed to act. As an excuse for his inaction and lack of involvement with his child, Father merely stated that he didn't know Mother's address, although he admitted he was able to speak to her on the telephone and contact her through social media. Father offered other excuses for his lack of contact with his son, saying that for one Christmas he was in the hospital, and for

3

another he was in jail, and claiming that he did not financially support the child because he supported a houseful of adults instead. Id. p. 14. This Court finds all of Father's excuses to be incredible, insubstantial and unavailing.

Based on Father's own testimony, as well as that of other witnesses and the record as a whole, pursuant to the statutory and case law of this jurisdiction, the Court finds that Mother has met her burden of proving by clear and convincing evidence that Father has utterly failed to perform any parental duties during the eighteen-to-twenty-two months prior to the filing this termination petition. Since Mother is now remarried and her husband is willing and able to adopt this child, the Court has come to a clear, non-hesitant conviction as to Father's settled purpose of relinquishing his claim to the child. See Matter of Sylvester, *supra.* . The Court, therefore, finds that Mother's request for the involuntary termination of Father's parental rights is warranted, and has been proven by clear and convincing evidence.

Accordingly, the Court enters the following: